UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-10087-FDS |
| | ) | |
| (1) DI'LON SMITH, a/k/a DILON SMITH, and | ) | |
| (2) DENZEL SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT DILON SMITH'S
MOTION TO SUPPRESS ALL EVIDENCE DERIVED FROM
THE EXECUTION OF A SEARCH WARRANT AT 177 MEGAN ROAD**

The United States respectfully requests that the Court deny defendant Dilon Smith's motion to suppress all evidence derived from the November 29, 2017 execution of a search warrant for the basement apartment of 177 Megan Road in Hyannis. The warrant was supported by probable cause. In the alternative, the *Leon* good-faith exception to the Fourth Amendment exclusionary rule applies.

## FACTS

In the late summer/early fall of 2017, Yarmouth and Barnstable police began investigating the movant, Dilon Smith ("Dilon"), and his fraternal twin brother, Denzel Smith ("Denzel"), for distributing fentanyl. Affidavit of Detective Peter Ginnetty in Support of Search Warrant for 177 Megan Road (DN 88-1), ¶ 1.

**1. The Search Warrants**

As part of the investigation, officers obtained five state search warrants:

    a.  A warrant for the basement apartment of 177 Megan Road in Hyannis and the defendants' persons was obtained on November 28 and executed on November 29. *See* DN 88-1.

1

b.   A warrant for 321 Mitchells Way in Hyannis and Denzel's Chevy Impala was obtained and executed on November 29. *See* DN 88-3.

c.   A warrant for 89 Lewis Bay Road, Apt. 209 in Hyannis, identified as the residence of Dilon and his girlfriend, A.S., was obtained on November 28 and executed on November 29. *See* Exhibit A.

d.   A warrant for a GPS tracker on Denzel's Impala was obtained on November 17. The tracker was affixed to the Impala from November 20 until after the defendants' arrest on November 29. *See* Exhibit B.

e.   A warrant for a GPS tracker on Dilon's BMW was obtained on November 22. The tracker was affixed to the BMW during the period November 26-29. *See* DN 88-5.

**2.   The Controlled Buy Reports and the Surveillance Reports**

The search warrant affidavits described a total of six controlled buys of narcotics from Dilon and Denzel. Police conducted a seventh controlled buy but did not include it in any of the search warrant affidavits. Two of the controlled buys – one from Dilon and one from Denzel – are described in the affidavit for the 177 Megan Road warrant. *See* DN 88-1, ¶¶ 7-8.

Because the confidential informants ("CIs") who made all seven purchases are concerned for their safety, the government has disclosed as little information as possible that could lead to their identification. Based on the government's agreement not to use any evidence of any of the controlled buys at trial, and given that the none of the controlled buys are charged, Magistrate Judge Dein issued an order, following a hearing, denying the defendants' motions to compel the government to produce any of the controlled buy reports or any information identifying the CIs. *See* DN 57 at 4; DN 76.

In their motions to compel, the defendants asked, for the first time, that the government produce surveillance reports connecting them to 177 Megan Road. *See* DN 68 at 1, DN 69 at 1. The government promptly agreed to produce the requested reports. *See* DN 71 at 1. Copies are attached to Dilon's motion to suppress. *See* DN 88-4.

### 3. Detective Ginnetty's Affidavit Supporting the Search Warrant Application for the Basement Apartment of 177 Megan Road

Barnstable Police Detective Peter Ginnetty's affidavit began with a description of his work as a police officer and his experience with the methods, routines, and practices of people involved in drug trafficking. DN 88-1 at DILON 0013. He then stated the following facts in support of his application:

- Barnstable and Yarmouth police began investigating Dilon and Denzel in the late summer/early fall of 2017. Numerous overdose victims and CIs had told police that the brothers were distributing large quantities of fentanyl and bragging about the potency and quality of their product. *Id.* ¶ 1.

- Dilon and Denzel already were well known to law enforcement. *Id.*

- According to the Massachusetts Registry of Motor Vehicles, Dilon lived at 89 Lewis Bay Road in Hyannis and Denzel lived in New Bedford. *Id.* ¶¶ 9-10.

- In October 2017, a CI identified as "CS1," who recently had bought heroin and/or fentanyl from Denzel, told Barnstable detectives that Denzel was selling large quantities of heroin and/or fentanyl in the mid-Cape area. CS1 said that Denzel conducted his transactions away from his primary residence, and that he charged about $100/gram but would sell larger quantities at a reduced price. *Id.* ¶ 2.

- Also in October 2017, a CI identified as "CS2," who recently had bought fentanyl from Dilon, told Detective Ginnetty that Dilon was selling large quantities of

fentanyl in and around Hyannis. CS2 said that Dilon conducted his transactions away from his primary residence, and that he charged about $100/gram or $50 for a half-gram. CS2 was a reliable informant who recently had assisted Barnstable police by making controlled purchases of drugs leading to the issuance of a search warrant, which, in turn, had led to an individual's arrest and conviction as well as the seizure of drugs and a gun. *Id.* ¶ 3.

- Based on his experience, Detective Ginnetty knew that drug dealers usually do not allow customers to come to their primary residence and prefer to make their sales within a small geographic area near their primary residence or their stash house. *Id.* ¶ 4.

- One day in October 2017, Detective Ginnetty saw Dilon park his BMW in the driveway of 177 Megan Road, enter the fenced backyard, and not emerge for a long period of time.[1] Detectives then began monitoring 177 Megan Road. *Id.* ¶ 5.

- Thereafter, detectives saw Dilon repeatedly enter and exit the fenced backyard of 177 Megan Road. *Id.*

- They also saw Dilon drive to various locations from 177 Megan Road, meet individuals for short periods of time, and then return immediately to 177 Megan Road. *Id.*

- They also saw him drive past 177 Megan Road and then circle back before parking at that address. They also saw Dilon, after parking in the driveway, look up and down Megan Road before entering the fenced backyard. Detective

---

[1] After the defendants were arrested, police learned that Dilon had signed a lease for the apartment starting October 23, 2017.

4

Ginnetty knew from his training and experience that this behavior was consistent with someone looking to see if he was being followed. *Id.*

- In November 2017, Yarmouth Police Detective Lundegren relayed information from a third CI, identified as "CS3," to Detective Ginnetty. According to CS3, Dilon recently had started to rent, and had moved into, the basement apartment of 177 Megan Road and was using it as a stash house. *Id.* ¶ 6. CS3 reported that Dilon entered the apartment through a door in the back of the house. *Id.* This was consistent with Detective Ginnetty's observation that Dilon entered the fenced backyard of the property and then did not emerge for a long period of time.

- During the week of November 18, CS1 made a controlled purchase of fentanyl from Denzel. The standard Barnstable police procedures for a controlled purchase were followed: CS1 made arrangements with Denzel to buy a specific amount of fentanyl for a specific price at a specific location in the Town of Barnstable; officers searched CS1 and his/her vehicle for drugs, weapons, and cash and found none; officers gave CS1 cash in the agreed-upon amount for the purchase; officers followed CS1 as he/she drove without interruption to the meet location; Detective Ginnetty saw Denzel and Dilon at 177 Megan Road; Ginnetty saw Denzel leave 177 Megan Road in his Impala, which went directly to the meet location; officers saw Denzel meet with CS1 at/in the Impala; CS1 and Denzel parted ways; officers followed CS1 as he/she drove without interruption to a prearranged location to meet with officers; CS1 gave the officers a baggie containing suspected narcotics; CS1 stated that he/she had bought the drugs from Denzel with the cash given to CS1 by the officers; officers searched CS1 for drugs,

weapons, and money and found none; and officers took custody of the suspected

drugs, which field-tested positive for the presence of fentanyl. *Id.* ¶ 7.

- Within 72 hours before Detective Ginnetty applied for the search warrant on

  November 28, CS2 made a controlled purchase of fentanyl from Dilon. The same

  procedures described above that were used for the controlled purchase from

  Denzel were again followed here. This time, Detective Foley saw Dilon's BMW

  leave 177 Megan Road and drive directly to the meet location, where Detective

  Ginnetty recognized the driver of the BMW as Dilon, and saw Dilon meet with

  CS2 before the two parted ways. *Id.* ¶ 8.

- On November 24, a man was shot on Fresh Holes Road in Hyannis; Dilon was

  identified as the shooter; and Denzel was identified as being present at the scene.

  *Id.* ¶ 13.

- A review of Denzel's criminal record showed 44 adult arraignments, including

  firearms offenses, separate convictions for Possession with Intent to Distribute

  Class A and Class B, and pending charges for Conspiracy to Violate the

  Controlled Substances Act as well as Possession with Intent to Distribute Class B

  – Subsequent Offense. Denzel also had been charged with numerous violent

  crimes. *Id.* ¶ 9.

- A review of Dilon's criminal record showed 24 adult arraignments, including

  Possession of a Class B Substance as well as convictions for firearms offenses. *Id.*

  ¶ 10.

Based on all of the above information stated in Detective Ginnetty's affidavit, Barnstable

District Court First Assistant Clerk-Magistrate John Costello signed a search warrant on

November 28 authorizing the search of the basement apartment of 177 Megan Road and the persons of Denzel and Dilon. *Id.* at DILON 0011; DN 88-2 at DILON 0102.

### 4.  The Execution of the Search Warrant

177 Megan Road is a small ranch house with a driveway on the left. *See* Exhibit C at 1. The entrance to the basement apartment is at the rear of the house. *See id.* at 2. To get to that entrance, one walks from the driveway through a fenced gate to the backyard and then turns right. *See id.* at 3.

At about 10:53 am on November 29, 2017, Detective Ginnetty saw a Honda Civic registered to Denzel's girlfriend, C.W. (MA plate 191RN4), in the parking area of 79 Lewis Bay Road in Hyannis. DN 88-2 at DILON 0102. Denzel was driving; Dilon was in the front passenger seat; and a third man, M.M., was in the rear passenger seat. *Id.*

At about 11:40 am, the Civic arrived at 177 Megan Road. Denzel was still driving, Dilon was still in the front passenger seat, and M.M. was still in the back. *Id.* at DILON 0103. After Denzel parked the Civic in the driveway, the men walked to the backyard and entered the basement apartment. *Id.* Detective Ginnetty was able to see the back of the house via a pole camera.

At 2:00 pm, Dilon's girlfriend, A.S., arrived at 177 Megan Road in Dilon's BMW. *Id.* She parked in the driveway, walked to the backyard, and entered the basement apartment. *Id.*

At 2:07 pm, the three men and A.S. walked out of the apartment and came around to the driveway. As Denzel was entering the driver's side of the Civic and A.S. was standing next to the BMW, officers announced themselves. They secured Denzel, Dilon, and A.S., and, after a brief chase, M.M. *Id.* at DILON 0103-04.

After officers *Mirandized* the brothers, DILON displayed shock that police knew about

the apartment, and DENZEL denied living there. *Id.* at DILON 0104-05.

Officers forced entry into the basement apartment, which was locked. *Id.* at USAO 0104. Inside the small apartment they found a loaded Smith & Wesson .22 caliber revolver and a Heckler & Koch .9mm semi-automatic pistol with two loaded magazines. *Id.* at USAO 0105-06. Officers also found baggies containing suspected fentanyl hidden in the drop ceiling of the bedroom and in sneakers in the bedroom closet. Officers also found baggies, cutting agent, two narcotics presses, and a digital scale. *Id.* They also found mail and other items in Dilon's name, and mail in Denzel's name.

After searching the apartment, officers searched the Civic. Inside the trunk they found a backpack containing a grinder with residue, blue gloves, plastic baggies, a 1000-gram bag of Mannitol (a cutting agent), a substance that tested positive for MDMA (Ecstasy), and an empty box for one of the narcotic presses found inside the apartment. *Id.* at DILON 0106. The backpack also contained mail addressed to Denzel and photos of Denzel's children. When Detective Ginnetty later removed the backpack from the evidence locker to take additional photographs, he found it also contained a digital scale.

A state police crime lab forensic chemist later determined that 102.09 grams of the powder seized from the apartment contained an analogue called cyclopropyl fentanyl, and 1.95 grams of the powder contained fentanyl.

**5.  The Criminal Charges**

On April 5, 2018, a federal grand jury indicted Dilon and Denzel on one count of being felons in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 2.

On October 18, 2018, a grand jury returned a superseding indictment charging the

defendants with the same offense as Count One, plus four additional charges: Possession with Intent to Distribute 100 Grams or More of a Controlled Substance Analogue, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi) and 18 U.S.C. § 2 (Count Two); Possession with Intent to Distribute Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Three); and two counts of Possessing a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A) and 18 U.S.C. § 2 (Counts Four and Five).

## ARGUMENT

The Court should deny Dilon's motion to suppress the evidence seized from the apartment because the search warrant was supported by probable cause, or, in the alternative, because the *Leon* good-faith exception to the exclusionary rule applies.

### 1.  The Search Warrant Was Supported by Probable Cause

Dilon bears the burden of proof on his motion to suppress. "Defendant bears the burden of proof to show that a search performed pursuant to a warrant was unconstitutional." *United States v. Burdulis*, Crim. 10-40003-FDS, 2011 WL 1898941, at *3 (D. Mass. May 19, 2011) (citing *Jarabo v. United States*, 158 F.2d 509, 515 n.3 (1st Cir. 1947); *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003)), *aff'd*, 753 F.3d 255 (1st Cir. 2014).

### a.  The Probable Cause Standard

The issue for the Court is whether the totality of the circumstances stated in Detective Ginnetty's affidavit established probable cause to search the apartment. *See United States v. Tiem Trinh*, 665 F.3d 1, 10 (1st Cir. 2011). The Court must "make 'a practical, common-sense' determination as to whether, 'given all the circumstances set forth in the affidavit . . . there [was] a fair probability that contraband or evidence of a crime [would] be found'" in the apartment. *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). A clerk-magistrate's determination that

information in a search warrant affidavit establishes probable cause receives "considerable deference," such that a reviewing court will reverse the determination "only if [there is] no "substantial basis for concluding that probable cause existed." *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999); *United States v. Dixon*, 787 F.3d 55, 58-59 (1st Cir. 2015)). In a "doubtful or marginal case," a reviewing court must defer to the probable cause determination made by the judicial officer who signed the warrant. *Tiem Trinh*, 665 F.3d at 10 (internal quotation marks omitted).

### b.  The Warrant Was Supported by Probable Cause

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed – the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched – the so-called 'nexus' element." *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999). A nexus "between enumerated evidence of the crime and the place can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide evidence of a crime." *United States v. Flores*, 888 F.3d 537, 548 (1st Cir. 2018). Dilon concedes that Detective Ginnetty's affidavit satisfies the commission element. *See* DN 88 at 28 ("the affidavit does establish that a crime has been committed"). He challenges only the nexus requirement.

Dilon's challenge is without merit. Several facts stated in Detective Ginnetty's affidavit establish the nexus requirement. First, a CI told police that Dilon recently had started to rent, and had moved into, the basement apartment of 177 Megan Road and was using it as a stash house. Second, one day in October 2017, Detective Ginnetty saw Dilon park his BMW in the driveway of 177 Megan Road, enter the fenced backyard, and not emerge for a long period of time. After police started monitoring 177 Megan Road, which was not Dilon's home, they saw him

repeatedly enter and exit the fenced backyard of the property. Third, police saw Dilon drive to various locations from 177 Megan Road, meet individuals for short periods of time, and then return immediately to 177 Megan Road, which the clerk-magistrate could have inferred to be behavior consistent with drug-dealing. Fourth, police saw Dilon (a) drive past 177 Megan Road and then turn around before parking at that address, and (b) look up and down Megan Road before entering the fenced backyard, which are behaviors consistent with someone looking to see if he was being followed, which, in turn, is not normal behavior for a non-criminal. Fifth, police saw Denzel leave 177 Megan Road in his Impala to meet a CI for a controlled purchase of fentanyl. And sixth, police saw Dilon leave 177 Megan Road in his BMW to meet a CI for a controlled purchase of fentanyl. These facts were more than sufficient to establish the nexus requirement. *See, e.g., United States v. Barnes*, 492 F.3d 33, 37 (1st Cir. 2007) ("This court has repeatedly found . . . that when a defendant sells drugs outside his home, it is reasonable to conclude that there is evidence of his drug dealing activity in the home, particularly when the defendant is observed leaving the home immediately prior to selling drugs.").

Dilon argues that probable cause was absent for three reasons. *See* DN 88 at 10-23. They will be addressed in turn.

First, he contends that Detective Ginnetty's affidavit was not based on firsthand knowledge, or "direct observation," that contraband or evidence of a crime would be found at 177 Megan Road. *See* DN 88 at 10-16. This was not required, however. "The nexus between the objects to be seized and the premises searched need not, and often will not, rest on direct observation, but rather can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide evidence of a crime." *United States v. Feliz*, 182 F.3d 82, 88 (1st Cir. 1999) (internal

quotation marks omitted). It was reasonable to conclude that Denzel and Dilon stored their drugs at 177 Megan Road given that they each, on separate occasions, left 177 Megan Road in their respective vehicles and went directly to a location where they sold drugs to a CI. *See Barnes*, 492 F.3d at 37. It was also a reasonable conclusion given the statement by CS3 that Dilon recently had begun renting and was living in the apartment and was using it as a stash house.

Second, Dilon contends that Detective Ginnetty's opinions, based on his training and experience, cannot replace missing facts. DN 88 at 16-20. But Detective Ginnetty's affidavit was replete with facts. He stated an opinion based on his training and experience only with regard to the following matters: (a) that drug dealers usually do not sell drugs out of their homes; (b) that they often store drugs in a stash house; (c) that they usually sell close to their home or stash house; (d) that they often change times and locations where they make their sales; and (e) that certain behaviors are consistent with a person looking to see if he is being followed. *See* DN 88-1, ¶¶ 4, 5. The clerk-magistrate did not err in relying on these stated opinions. *See, e.g., United States v. Bain*, 874 F.3d 1, 23 (1st Cir. 2017) ("This court has, with a regularity bordering on the echolalic, endorsed the concept that a law enforcement officer's training and experience may yield insights that support a probable cause determination.") (internal quotation marks omitted), *cert. denied*, 138 S. Ct. 1593 (2018).[2]

In his final argument challenging probable cause, Dilon contends that Detective Ginnetty's affidavit did not adequately establish the veracity of CS1, CS2, or CS3. The government disagrees.

---

[2] Dilon points out that there were several locations other than 177 Megan Road where the defendants could have been storing their drugs, including their girlfriends' residences. DN 88 at 19. That is true. Police reasonably obtained search warrants for those locations too, as Dilon concedes. *Id.* The fact that officers were thorough does not show that their application for the 177 Megan Road warrant lacked probable cause.

The credibility of CS1's statement that Denzel was selling large quantities of heroin and/or fentanyl in the mid-Cape area and was meeting customers at various locations away from his primary residence was supported by CS1's assertions that he/she knew Denzel, recently had bought heroin and/or fentanyl from Denzel, knew what price Denzel charged, and was familiar with fentanyl because CS1 was a drug user. DN 88, ¶ 2. Those assertions, in turn, were corroborated when CS1 successfully made a controlled purchase from Denzel. *Id.* ¶ 7.

The credibility of CS2's statement that Dilon was selling large quantities of fentanyl in the Hyannis area and was meeting customers at various locations away from his primary residence was supported by CS2's assertions that he/she knew Dilon, recently had bought fentanyl from Dilon, knew what price Dilon charged, and was familiar with fentanyl because CS2 was a drug user. *Id.* ¶ 3. Those assertions, in turn, were corroborated when CS2 successfully made a controlled purchase from Dilon. *Id.* ¶ 8. Moreover, Detective Ginnetty wrote in his affidavit that CS2 was a reliable informant who recently had assisted Barnstable police by making controlled purchases of drugs leading to the issuance of a search warrant, which, in turn, had led to an individual's arrest and conviction as well as the seizure of drugs and a gun. *Id.* ¶ 2.

The credibility of CS3's statement about Dilon recently moving into 177 Megan Road and using it as a stash house was corroborated by police surveillance of Dilon repeatedly using that address (including repeatedly leaving the address and quickly returning to it after meeting different people at different locations) even though it was neither his nor his girlfriend's residence, and by the fact that Dilon went directly from 177 Megan Road to a location where CS2 made a controlled purchase from him. Moreover, video from the pole camera confirmed CS3's statement that the entrance to the basement apartment was located at the back of 177

Megan Road, indicating that CS3 was, in fact, familiar with the apartment or at least its entrance/exit.

When an affidavit is based wholly or in part on information from an informant, "[t]he informant's story and the surrounding facts" must merely "possess[] an internal coherence that g[ives] weight to the whole." *Massachusetts v. Upton*, 466 U.S. 727, 734 (1984). That standard was more than satisfied here.[3]

### 2. Dilon Is Not Entitled to a *Franks* Hearing

"Affidavits supporting search warrants are presumptively valid." *United States v. Owens*, __ F.3d __, 2019 WL 926160, at *7 (1st Cir. Feb. 26, 2019). "A defendant may rebut this presumption and challenge the veracity of a warrant affidavit at a pretrial hearing commonly known as a *Franks* hearing." *Id.* (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). "To be entitled to a *Franks* hearing, however, a defendant must first make two substantial preliminary showings: (1) that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth; and (2) the falsehood or omission was necessary to the finding of probable cause." *Id.* (internal quotation marks omitted). "A defendant's failure to make a showing on either of these two elements dooms his challenge." *Id.* (internal quotation marks omitted).

Dilon first alleges that Ginnetty made false statements or omissions in paragraph 5 of his affidavit. *See* DN 88 at 24-25. Paragraph 5 recites the following facts. First, on an unidentified

---

[3] Dilon argues that even if the affidavit sufficiently established CS1's and CS2's reliability with regard to the fact that Denzel and Dilon were selling fentanyl on the Cape, there was no information in the affidavit about their knowledge that the brothers were using 177 Megan Road as a stash house. *See* DN 88 at 21-22. The affidavit does not state, however, that either CS1 or CS2 told police that the brothers were using 177 Megan Road. The nexus to 177 Megan Road was established by other evidence detailed in the affidavit, not by any statements by CS1 or CS2.

date in October 2017, Detective Ginnetty saw Dilon pull his BMW into the driveway of 177

Megan Road, enter the fenced backyard, and not emerge for a long period of time. Second, at

some unspecified point in time following this incident,[4] detectives began monitoring 177 Megan

Road and saw Dilon entering and exiting the fenced backyard. Third, police followed Dilon to

various locations where he conducted short meetings with people and immediately returned to

177 Megan Road. Fourth, Ginnetty saw Dilon drive by 177 Megan Road and circle back before

parking, and saw him look up and down the street before entering the fenced backyard. DN 88-1,

¶ 5.

Dilon asserts that the statements in Paragraph 5 must be false because Detective

Ginnetty's surveillance reports do not mention them. *See* DN 88 at 24. But that is not entirely

correct. His surveillance reports state that he saw Dilon's BMW (MA plates 6ZF699) at 177

Megan Road on November 7, 14, 15, and 16. *See* DN 88-4. It is true that the surveillance reports

omit dates and details stated in paragraph 5 of the affidavit. But the surveillance reports do not

*contradict* statements in paragraph 5. At most, they show that Ginnetty is not a detailed

recordkeeper. The fact that not all of the statements in paragraph 5 are documented in

surveillance reports does not constitute a substantial preliminary showing of any false statement

or omission in the affidavit. Nor has Dilon made a substantial preliminary showing of

materiality. Even without paragraph 5, probable cause was established by the two controlled

buys and CS3's report that Dilon was using 177 Megan Road as a stash house.

---

[4] Dilon alleges that the remaining events described in ¶ 5 must have occurred in October. *See* DN 88 at 24-25. But Ginnetty's affidavit does not say that. Indeed, given that Dilon did not sign a lease until October 23, *see supra* n.1, it is more likely that the events occurring after the initial sighting occurred in November.

Dilon also asserts that the statements in paragraph 8 of the affidavit, which describes CS2's controlled buy from Dilon, must be false because Ginnetty's surveillance notes do not mention that incident. *See* DN 88 at 25. But that is because Ginnetty documented the event in a controlled buy report, not a surveillance report. As noted previously, Magistrate Judge Dein denied the defendants' motions to compel the government to produce any controlled buy reports. *See supra* at 2.

Next, Dilon attacks the wording in paragraph 7 of Ginnetty's affidavit, which describes CS1's controlled buy from Denzel. *See* DN 88 at 25-26 & n.10. As Dilon correctly notes, one of Detective Ginnetty's surveillance reports documents events immediately preceding that controlled buy. The surveillance report states that, on November 14, Ginnetty saw Denzel's Impala slowly drive by 177 Megan Road. Then he saw Denzel exit from the rear of the house while on his cell phone. The Impala promptly returned, and Denzel got into the passenger side. The Impala then headed directly to Sea Meadow Village. *See* DN 88-4 at DILON 0567. The controlled buy report (which the government did not produce) states that, when the Impala met CS1 at Sea Meadow Village, Detective Chevalier saw that Denzel was in the front passenger seat, and he saw a hand-to-hand transaction between Denzel and CS1. The affidavit does not mention the second person in the Impala because Detective Ginnetty wanted to provide as little information as possible that would help someone identify CS1.[5] He made that omission knowingly and intentionally. No *Franks* hearing is warranted, however, because disclosure of the fact that a second person was in the car would not have eliminated probable cause. It is true that

---

[5] The affidavit states: "Shortly before the scheduled meet, Det Ginnetty observed [Denzel] leave 177 Megan Rd and drive directly to meet with CS1 in the Impala." DN 88-1 ¶ 7. The use of "drive" in this sentence is consistent with colloquial use. It is not uncommon to say, *e.g.*, "we drove to the store," when in fact only one person was behind the wheel.

the fentanyl purchased by CS1 could have come from the driver instead of from Denzel. But that was not likely given CS1's report that Denzel, not some other person, was selling large quantities of heroin and/or fentanyl in the mid-Cape area, and CS1's admission that he/she recently had bought heroin and/or fentanyl from Denzel in the mid-Cape area. *See* DN 88-1 ¶ 2. In any event, even excising the entire controlled buy from Denzel (*i.e.*, all of ¶ 7) would not eliminate probable cause since most of the facts in the affidavit concerned statements about Dilon, observations of Dilon's behavior, and the controlled buy from Dilon.

Finally, Dilon takes issue with a perceived distinction between language in Detective Ginnetty's affidavit for the 177 Megan Road warrant, and language in his affidavit for the BMW GPS tracker warrant, regarding amounts of fentanyl being sold by the brothers. *See* DN 88 at 26-27. There is no discrepancy, however, with regard to statements about *Denzel*'s sales. Only the 177 Megan Road affidavit addresses that: it says that CS1 told Detectives Cunningham and Chevalier that Denzel was selling "large" quantities of heroin and/or fentanyl combination in the Mid-Cape area. DN 88-1, ¶ 2. With regard to sales by *Dilon*, that same affidavit says that CS2 reported Dilon was selling "large" quantities of fentanyl in the Hyannis area, *id.* ¶ 3, whereas the tracker affidavit says that CS2 said Dilon was selling "street-level" quantities of blue-colored fentanyl in the Hyannis area, DN 88-5 ¶ 5. This distinction is too minor to qualify as a "substantial" showing required for a *Franks* hearing. Nor is it material to a finding of probable cause.

### 3. The *Leon* Good-Faith Exception Applies

If the Court finds that probable cause was absent, it should nevertheless deny Dilon's suppression motion in light of the *Leon* good-faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 905 (1984) (modifying the exclusionary rule "so as not to bar the

admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective").

*Leon* does not apply in four circumstances: (1) if the issuing magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) if the magistrate "wholly abandoned his judicial role"; (3) if the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) if the warrant "is so facially deficient – *i.e.*, in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923; *United States v. Levin*, 874 F.3d 316, 322 (1st Cir. 2017); *United States v. Woodbury*, 511 F.3d 93, 99 (1st Cir. 2007).

Dilon argues that the third circumstance applies. *See* DN 88 at 28-29. His position is without merit. As explained *supra*, Detective Ginnetty's affidavit was supported by ample probable cause.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny Dilon's motion to suppress.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney


By: */s/ Christine J. Wichers*
CHRISTINE J. WICHERS
Assistant U.S. Attorney

18

**<u>Certificate of Service</u>**

I certify that, on March 15, 2019, this document filed through the ECF system was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>*/s/ Christine J. Wichers*</u>
Christine J. Wichers